OPINION
{¶ l} Appellant, Andrew W. Fulmer, appeals from the judgment entry of the Lake County Court of Common Pleas convicting him, after a trial by jury, on one count of felonious assault and two counts of assault; appellant further appeals the trial court's sentencing order. For the reasons herein, we reverse and remand.
 {¶ 2} On October 23, 2005, Anne Mary Kinter, appellant's former fiancée, placed a 9-1-1 emergency call to the Willowick Police Department. Evidently, Ms. Kinter and appellant had recently broken up and appellant had advised her he had consumed a "bottle of pills." Willowick Police Officer Jeffrey Pyle responded to the call. After consulting Kinter, Pyle learned appellant had removed himself to a garage owned by his friend, Gene Trebec. The garage, located in Eastlake, Ohio, was part of a business owned by Trebec. At the officer's request, Kinter called Trebec, explained the situation, and asked him to meet the police at the garage. Trebec agreed and indicated he would be there "right away."
 {¶ 3} While en route to the garage, Officer Pyle notified the Eastlake Police Department for assistance. Officer Pyle arrived and was soon joined by Eastlake Police Officers Vince Cronin and David Koehnle, as well as Eastlake Auxiliary Officer Jamie Hogya. The officers loudly knocked on the door of the garage; after receiving no answer, they decided to wait for Trebec. Suddenly, appellant emerged from the garage and obstreperously inquired: "What the f**k do you [officers] want?" Appellant was talking on his cell phone and appeared "irate."[1]
 {¶ 4} The officers explained they were dispatched to check on appellant's welfare. They informed appellant that an emergency call had been placed reporting he had ingested some pills. Appellant, still on the phone, returned to the interior of the garage. The officers followed, asking what appellant had ingested. Although generally non-communicative, appellant related he had taken aspirin. After learning this, officers repeatedly asked appellant how many pills appellant had ingested. Appellant curtly replied that this was "none of [their] f* * *ing business." At this point, the officers sent for an EMS squad.
 {¶ 5} Once inside the garage, Officer Pyle instructed appellant to "hang up" the phone and "have a seat." Officer Pyle then threatened to handcuff appellant. However, as he approached, appellant pushed the officer and struck him in the face with a closed fist. Officer Cronin immediately advised appellant he was under arrest and advanced on appellant. Pyle and Cronin attempted to grab appellant's arms and handcuff him but their efforts were unsuccessful. Officer Cronin testified:
 {¶ 6} "[appellant's] arms were swinging. He was swinging an arm with [a] closed fist. Physically pushing us. Kicking us, pulling away as we were trying to grab his arms to handcuff [them]. Screaming, yelling. He was definitely resisting and he did not want to be handcuffed."
 {¶ 7} Officer Koehnle entered the affray and attempted to take appellant to the ground but was unsuccessful. During the struggle, appellant obtained one of the officer's flashlights and struck Officer Koehnle in the back of the head with the implement. Auxiliary Officer Hogya witnessed the blow:
 {¶ 8} "[Officer Koehnle] tried picking the guy — getting him in a bear hug and he dropped his flashlight and at that time he wasn't — he was bent over, the Defendant picked up the flashlight with his right hand and hit Officer Koehnle in the back of the head * * *."[2]
 {¶ 9} Officer Pyle ultimately sprayed appellant with pepper spray. The spray discharged in an indirect fashion and, in doing so, hit not only appellant but Officers Pyle and Cronin. Afterwards, Officer Cronin was able to grab appellant's legs and take him to the ground. However, while on the ground, appellant proceeded to kick Cronin in the chest and shoulder. Eventually, appellant was subdued and placed under arrest. Evidence established, as a result of the fight, Officer Pyle suffered a bruise to his face and various cuts and scrapes, Officer Cronin suffered a sprained shoulder, and Officer Koehnle possessed a large, golf ball-sized knot on the back of his head.
 {¶ 10} On January 25, 2005, appellant was indicted on one count of felonious assault, a felony of the first degree, in violation of R.C.2903.11(A)(2) and two counts of assault, felonies of the fourth degree, in violation of R.C. 2903.13(A). Appellant waived his right to be present at the arraignment and, as such, the court entered a plea of "not guilty" on his behalf.
 {¶ 11} Appellant's jury trial began on June 7, 2005 and, on June 9, 2005, the jury returned verdicts of guilty on all charges. On July 25, 2005, appellant was sentenced to four years imprisonment for the felonious assault conviction and six months imprisonment for each assault conviction. The trial court ordered each sentence to run concurrently for an aggregate term of four years.
 {¶ 12} Appellant now appeals and assigns four errors for our consideration. His first assignment of error reads:
 {¶ 13} "The trial court abused its discretion when[,] in its charge to the jury[,] it unconstitutionally diluted the requirement that the state prove each and every element of the offenses beyond a reasonable doubt."
{¶ l4} Under his first assignment of error, appellant contends the trial court provided an improper jury charge when it instructed the jury it could not consider any evidence relating to his medical condition or low intelligence. We disagree.
 {¶ 15} When charging the jury, the trial court "must state to it all matters of law necessary for the information of the jury in giving its verdict. The court must also inform the jury that the jury is the exclusive judge of all questions of fact." R.C. 2945.11; see, also,State v. Braxton (1995), 102 Ohio App.3d 28, 43.
 {¶ 16} An appellate court reviews challenged jury instructions within the context of the entire charge. Id. When considering a trial court's jury instructions, we will reverse only where the court abused its discretion in utilizing the challenged instructions and the defendant was prejudiced by the court's decision. Id. An abuse of discretion occurs where the trial court's decision is arbitrary, unreasonable, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157. A party is prejudiced only when the alleged instructional flaw acts to undermine the entire charge. Id.
 {¶ 17} In the instant matter, appellant was convicted of one count of felonious assault, in violation of R.C. 2903.11(A)(2) and two counts of assault in violation of R.C. 2903.13(A). The culpable mental state for each offense is "knowingly." Pursuant to R.C. 2901.22(B), the trial court charged the jury as follows:
{¶ l8} "a person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
 {¶ 19} "Knowingly means that a person is aware of the existence of the facts and that his acts will probably cause a certain result. Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances whether there existed at the time in the mind of the Defendant an awareness of the probability that his conduct would cause, Count One, physical harm to David Koehnle; Count 2, physical harm to Vince Cronin; and Count Three, physical harm to Jeffrey T. Pyle."
 {¶ 20} The court's instructions continued:
 {¶ 21} "You have heard evidence regarding the Defendant's mental state prior to and at the time of the alleged offenses. You are hereby instructed that the Defendant has not raised the defense of not guilty by reason of insanity, and as the State of Ohio does not recognize the partial defense of diminished capacity, you are not to consider any evidence as to low intelligence or the Defendant's medical condition in determining whether the Defendant possessed the requisite mental state, i.e, [sic] knowingly, during the commission of the alleged offenses."
 {¶ 22} Appellant does not take issue with the instructions addressing the definition of "knowingly." Rather, appellant challenges the court's limiting instruction regarding what the jury may not consider in its deliberations, viz., his "low intelligence" and "medical condition."
 {¶ 23} Initially, we believe it necessary to point out that the evidence heard by the jury pertaining to appellant's so-called "low intelligence" lacked any true probative character. Specifically, appellant's mother testified he possessed low intelligence owing to a premature birth. However, during cross-examination, she qualified her testimony indicating appellant had poor reading comprehension. To the extent appellant's alleged poor reading comprehension had no bearing upon whether he acted "knowingly," the issue of his "low intelligence" is not applicable to the case.
 {¶ 24} On the other hand, the evidence relating to appellant's alleged medical condition was relevant to his defense and probative of whether he could formulate the requisite intent to "knowingly" assault the officers in question. Further, to the extent the state failed to object to its introduction, we see no basis for excluding it from the jury's deliberations. Specifically, Dr. William Bligh-Glover, a forensic pathologist, was called by the state and testified that the blunt force injury of being struck with a flashlight could cause death under certain circumstances. On cross-examination, defense counsel elicited testimony from Dr. Bligh-Glover that aspirin (i.e., the pills allegedly consumed by appellant), when taken in large enough doses, could impair if not kill an individual. Dr. Bligh-Glover testified that an aspirin overdose could change the body's PH level thereby causing a "metabolic derangement." Dr. Bligh-Glover stated that when one is under the stress of metabolic derangement, one's brain "doesn't work right."
 {¶ 25} In appellant's view, the exclusion of this evidence as it related to the mens rea prong of the crimes with which he was charged violated his right to due process. In support, appellant cites State v.Kincaid, 9th Dist. No. 01CA007947, 2002-Ohio-6116.
 {¶ 26} In Kincaid, the appellant (Kincaid) called police claiming he had been robbed at gunpoint. When questioned by the responding officer, Kincaid provided various conflicting accounts of the episode. According to the officer, Kincaid appeared delusional and so he placed Kincaid in the back seat of his cruiser (it was ultimately established that Kincaid had ingested PCP on the night in question). After a background check, the officer learned Kincaid had called the police in the past with false accounts of being robbed. Kincaid was subsequently placed under arrest for filing false reports and transported to the hospital for evaluation. While at the hospital, Kincaid was pugnacious and disruptive. As officers attempted to subdue him, Kincaid tried to remove an officer's revolver from the holster. He was prevented from doing so but the officer and a physician sustained injuries in the fracas. Kincaid was charged with one count of aggravated robbery, one count of assault on a police officer, and one count of assault. During its jury charge, the trial court stated:
 {¶ 27} "'You have heard evidence regarding the defendant's mental state prior to and at the time of the offense. You are hereby instructed that the defendant has not raised the defense of not guilty by reason of insanity, and as the State of Ohio does not recognize the partialdefense of diminished capacity, you are to disregard any evidence ofdefendant's mental state.'" Kincaid, supra, at ¶ 16. (Emphasis sic.)
 {¶ 28} Kincaid was found guilty on all counts.
 {¶ 29} On appeal, the Ninth Appellate District considered, inter al., the validity of the foregoing jury charge. The court acknowledged the instructions were designed to prevent the jury from concluding Kincaid suffered from diminished capacity at the time of the offense; however, because the instructions required the jury to disregard any evidence of Kincaid's mental state, the Ninth District held the instruction went "too far" and reversed the matter on this basis. That is, the appellate court held the trial court's instruction mandated the jury to disregard an essential element of the crimes charged, i.e., that appellant acted knowingly.
 {¶ 30} Here, we do not believe the trial court lessened the prosecution's burden of proof, i.e., the jury was not foreclosed for considering all evidence of appellant's mental state. However, we do believe the trial court overstepped the boundaries of its role by removing uncontested, relevant and probative evidence from the jury's consideration. Testimony indicated that as a result of consuming too much aspirin, appellant may have been biochemically imbalanced, i.e., in the parlance of Dr. Bligh-Glover, appellant may have been "metabolically deranged." This evidence is certainly relevant to whether appellant was capable of formulating the requisite intent to commit the crimes at issue. At no point did appellee object to this evidence and, perhaps more importantly, at no point did appellant's counsel assert a defense of diminished capacity.
 {¶ 31} It is worth pointing out that our observations pertaining to this issue should not be construed as a judicial resurrection of the defense of diminished capacity. The trial court's statement that diminished capacity is not an operative defense in Ohio is a true and accurate statement of the law. See, e.g., State v. Wilcox (1982),70 Ohio St.2d 182, paragraph one of the syllabus.[3] However, because diminished capacity was neither explicitly asserted nor implicitly argued, the trial court curbed the consideration of relevant, probative evidence based upon the speculative possibility that the jury might use the evidence to draw a legal conclusion that had not been argued. There is always the possibility of nullification; however, this possibility does not give the trial court license to block consideration of relevant evidence to which the state never objected. In a situation such as this, due process demands that the jury have the capability of entertaining the evidence of appellant's medical condition irrespective of the possibility that it might draw "forbidden conclusions" from the same.
 {¶ 32} Defense counsel utilized testimony derived from the state's medical expert as a means of demonstrating appellant may not have had a sufficiently culpable mental state to permit a conviction on the charged offenses. To the extent the evidence was relevant, probative, and not objected to; we believe the jury was entitled to entertain it during its deliberations. It is the view of this court, therefore, that the trial court's sua sponte intercession of the instructions at issue infringed upon the province of the jury thereby denying appellant due process of law. The trial court's actions were unreasonable and constitute an abuse of discretion. Moreover, because the instructions prevented the jury from hearing evidence which directly relates to whether appellant could formulate requisite intent for the crimes, we believe their use prejudiced appellant such that the entire charge was undermined.
 {¶ 33} Appellant's first assignment of error is therefore sustained.
 {¶ 34} As appellant's first assignment of error is dispositive of the instant appeal, appellant's remaining assignments of error are moot and need not be addressed. Therefore, for the reasons set forth above, we reverse appellant's convictions and remand this matter for a new trial.
WILLIAM M. O'NEILL, J., concurs,
CYNTHIA WESTCOTT RICE, J., dissents with Dissenting Opinion.
[1] Testimony established appellant was on the phone with Ms. Kinter when the officers arrived. Although unsure of his physical or mental state, Kinter testified she believed appellant had taken something from the way he sounded on the phone.
[2] Auxiliary Officer Hogya testified he observed the fight but did not participate because, as an auxiliary officer, he is not covered under the department's insurance.
[3] In Wilcox, the Supreme Court determined the partial defense of diminished capacity was not viable in Ohio. One of the principle foundations for this holding was the recognition that diminished capacity "posits a series of rather blurry lines representing gradations of culpability." Id. at 193. Because of the line drawing problems, the court determined such evidence would not enable juries, or the trial court "who must instruct them, to bring the blurred lines of diminished capacity into proper focus so as to facilitate principled and consistent decision-making in criminal cases." Id. However, the court did note that the effects of medication upon state of mind is part of common human experience which "in varying degrees, [are] susceptible to quantification or objective demonstration, and to lay understanding." Id. at 194.