THE STATE OF OHIO, APPELLANT, *v.* FULMER, APPELLEE.

[Cite as *State v. Fulmer,* 117 Ohio St.3d 319, 2008-Ohio-936.]

(No. 2007–0265—Submitted January 8, 2008—Decided March 12, 2008.)

O'CONNOR, J.

{¶ 1} On January 25, 2005, appellee, Andrew W. Fulmer, was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(2) and two counts of assault in violation of R.C. 2903.13(A). After trial to a jury, he was convicted on all charges.

{¶ 2} In his ensuing appeal, the court of appeals concluded that the trial court "overstepped the boundaries of its role by removing uncontested, relevant and probative evidence [about Fulmer's alleged medical condition] from the jury's consideration." *State v. Fulmer,* Lake App. No. 2005–L–137, 2006-Ohio-7015, 2006 WL 3833870, ¶ 30. It reversed the convictions and remanded the cause for a new trial. Id. at ¶ 34.

{¶ 3} We accepted the state's discretionary appeal, *State v. Fulmer,* 113 Ohio St.3d 1512, 2007-Ohio-2208, 866 N.E.2d 511, which asserts a single proposition of law: "When [defense] counsel elicits medical testimony regarding defendant's state of mind and makes a diminished capacity argument, the trial court is correct to instruct the jury that [it is] not to consider any evidence as to medical condition in determining that the defendant possesses the requisite mental state."

For the reasons that follow, we agree with the state's proposition. Accordingly, we reverse the decision of the court of appeals.

## RELEVANT BACKGROUND

{¶ 4} On October 23, 2004, police responded to a 9–1–1 call from Fulmer's former fiancée. She reported that after she ended her relationship with Fulmer, he told her he had taken "a bottle of pills" and that it "[d]oesn't matter anymore." Notably, although Fulmer initially said that he had taken "a bottle of pills," he also told her that he "threw up the pills." Thus, at the outset, there is a significant question whether Fulmer actually digested and metabolized any "pills" that he may have swallowed.

{¶ 5} To the extent that there was any evidence of actual ingestion of a drug, the evidence at trial established only that Fulmer had taken three aspirin for proper therapeutic purposes. Indeed, he specifically denied being suicidal or taking any other medication and told emergency medical personnel that "all he took all day was three aspirin" for preexisting back pain unrelated to his assault on the police or his ensuing arrest. There is no evidence in the record that warrants an inference, let alone a conclusion, that Fulmer took a bottle of aspirin or an overdose of any drug.

{¶ 6} The evidence at trial was uncontroverted that when police arrived to assist Fulmer, they did not find a man who appeared physically injured or weakened. Nor did they find a man who was lethargic or withdrawn. Rather, they were confronted by a man who was belligerent and uncooperative, displayed "a cocky demeanor," and used an "aggressive" or "authoritative" voice to demand that they leave the premises. When the police properly refused to accede to his demands due to their concerns for his well-being and the safety of the public, Fulmer attempted to leave the scene and forcefully pushed an officer to make his escape. A melee ensued.

{¶ 7} During the melee, Fulmer, who at the time of the incident was 39 years old, six feet, three inches tall, and weighed 250 pounds, punched one officer in the face, attempted to strike two others, and managed to secure an officer's flashlight and then strike him in the back of the head with it.

{¶ 8} Police used pepper spray in an attempt to subdue Fulmer, but Fulmer continued his efforts to strike at officers with his closed fists. Even after Fulmer was taken to the ground by the police, he kicked one of the officers in the chest and shoulders. Ultimately, all three officers sustained injuries during the altercation.

{¶ 9} The evidence also established that prior to and during the incident, Fulmer spoke at length on a cellular phone with his ex-fiancée and that he was

coherent and could understand the officers' commands. There is no suggestion that his hearing was impaired.

{¶ 10} After his arrest, Fulmer did not complain of any symptom indicative of an aspirin overdose, such as acidosis or stomach pain, to emergency medical technicians or at the emergency department at the hospital where he was evaluated and treated. His medical reports reveal that his physical examination was negative for headache, nausea, abdominal pain, vomiting, "problems urinating," and visual disturbances, and toxicology results did not show elevated levels of acetaminophen or aspirin in his bloodstream.

{¶ 11} In addition to the foregoing evidence, the jury heard the testimony of the state's expert witness, Dr. William Bligh–Glover. Dr. Bligh–Glover, a forensic pathologist, was called to establish the potential lethality of a blunt-force blow by a flashlight to the head. On both cross-examination and redirect examination, however, Dr. Bligh–Glover also testified about the effects of an aspirin overdose. Because of the importance of that testimony to the legal questions posed by this appeal, it is necessary to set it forth in detail:

{¶ 12} "Q. [COUNSEL FOR FULMER] Okay. Doctor, now I don't know if you know a little about his case, but you have done autopsies on suicide persons?

{¶ 13} "A. [DR. BLIGH–GLOVER] Yes, I have.

{¶ 14} "Q. You know things, a lot of people you hear take aspirin, whatever, to kill themselves. Aspirin is capable of killing someone?

{¶ 15} "A. That's correct.

{¶ 16} "Q. If taken in large enough doses?

{¶ 17} "A. That's correct.

{¶ 18} "Q. I think you noted, when we spoke earlier, you indicated a variety of things that manifests themselves as a result of aspirin overdose I guess it would be called?

{¶ 19} "A. That is correct.

{¶ 20} "Q. One of those thing[s] would be kidneys shutting off as a result of overdosing of some sort?

{¶ 21} "A. Kidney is one of the main problems that you have with misuse or overdose. You can [have] necrosis of the tips of the renal papillary.

{¶ 22} "Q. Okay. What is the tips of the renal papillary?

{¶ 23} " * * * [Explanation by Dr. Bligh–Glover]

{¶ 24} "Q. I think you did mention hyponatremia[ ] is something that may result?

{¶ 25} "A. Well, that's one thing. Another thing that can result from aspirin overdose is a change in the body's PH. Aspirin, the scientific name is acetylsalicylic acid, aspirin is an acid drug and it can cause, I believe, metabolic derangement which forms metabolic acidosis which means the body's PH which should be neutral, goes too far in the acid range and that can cause difficulty.

{¶ 26} "Q. You mentioned hyponatremia?

{¶ 27} "A. Hyponatremia was brought up, I mentioned in terms of water intoxation [sic].

{¶ 28} "Q. Hyponatremia—

{¶ 29} "A. Not involving the aspirin overdose, okay. I think I did mention hyponatremia.

{¶ 30} "Q. Hyponatremia is something nobody wants. You would not want? When we spoke earlier you said—

{¶ 31} "A. I don't think anybody wants any metabolic derangement. So no I said you wouldn't want—

{¶ 32} "Q. The statement to me at least at the time, makes your brain cuckoo; is that correct?

{¶ 33} "A. Most metabolic derangement the brain looks like—for a proper brain to function, the brain should be fairly, essentially tight control, physiological state. With a derangement, what it means to me, be it a high temperature, be it too low a temperature; metabolic acidosis says the blood PH gets too low or too high and the brain doesn't work right.

{¶ 34} "Q. I think [you] indicated sometimes breathing will be difficult with—

{¶ 35} "A. That's one of the things that is the brain isn't working right. It doesn't control breathing—versus heart beat, versus blood pressure, the consciousness, level of the consciousness as well.

{¶ 36} "Q. These are all things that you as a toxicologist—hyponatremia can be a serious medical condition?

{¶ 37} "A. That's correct.

{¶ 38} "Q. One of them that can make your brain go cuckoo I think is the way you put it in laymen's terms earlier?

{¶ 39} "A. Yes."

{¶ 40} On redirect examination of Dr. Bligh–Glover, the state then elicited the following testimony:

{¶ 41} "Q. Now, you were asked a series of questions about consumption of aspirin. What was that condition that you called it?

{¶ 42} "A. We talked about many things. If you take too much aspirin you can—there is several medical conditions that can relate, A, would be metabolic acidosis, where the blood PH gets too acidic which would be too low. You can get kidney problems, other things can cause problems with aspirin, can lose hearing because it affects the eighth cranial nerve which lets you hear.

{¶ 43} "Q. Let's talk about those collectively. You mentioned acidosis, kidney problems, hearing problems?

{¶ 44} "A. Correct.

{¶ 45} "Q. Do you have an opinion as to whether the consumption of three aspirin tablets over-the-counter source, taken by a man that weighs approximately 250 pounds, would result in the conditions that you just described to this jury?

{¶ 46} "A. From an over-the-counter source, would that be the standard 325 milligrams of aspirin?

{¶ 47} "Q. Let's take the high one, 500?

{¶ 48} "A. Aspirin isn't a large over-the-counter dosage.

{¶ 49} "Q. So what my question is: Do you have an opinion as to whether a 250–pound man, takes three aspirin tablets of 500 milligrams of aspirin, whether any of those conditions would result?

{¶ 50} "A. Yes. I have [an] opinion.

{¶ 51} "Q. Is that opinion to a reasonable level of scientific certainty?

{¶ 52} "A. Yes, it is.

{¶ 53} "Q. What is your opinion?

{¶ 54} "A. *Those toxic conditions would not result actually for a person of 250 pounds taking three aspirin tablets, even extra strength. That's probably a good therapeutic dose.*

{¶ 55} "Q. What would your expectation be of a grown man of 250 pounds taken three aspirin, would you expect any of the conditions that you just outlined for this jury?

{¶ 56} "A. *I wouldn't, no. I would expect his headache to go away. Other than that, I don't expect any harm to come to him whatsoever.*" (Emphases added.)

{¶ 57} No other medical or expert testimony was presented at trial regarding "metabolic derangement" or the alleged effects of aspirin on the body.

{¶ 58} After the parties rested, but before closing arguments, the judge ruled that he would not instruct the jury on a diminished-capacity defense.

{¶ 59} During summation, Fulmer's counsel stressed to the jury that, in order to convict, the jury must find that Fulmer acted "knowingly." See R.C.

2903.11(A)(2) and 2903.13(A). Defense counsel may take some liberties in attacking the state's evidence during closing statements, see, e.g., *Pang v. Minch* (1990), 53 Ohio St.3d 186, 194, 559 N.E.2d 1313, and it was not improper for Fulmer's counsel to argue that the state was required to establish that Fulmer had acted knowingly in order to prove the assault and felonious-assault charges.

{¶ 60} Here, however, counsel went over the line when he argued that the jury should consider the testimony of the physician in determining whether Fulmer knew what he was doing during the assaults and whether he had the right state of mind. Despite his protestations to the contrary, counsel was asserting a diminished-capacity defense.

{¶ 61} The trial judge then properly instructed the jury, "[t]he Defendant has not raised the defense of not guilty by reason of insanity, and as the State of Ohio does not recognize the partial defense of diminished capacity, you are not to consider any evidence as to low intelligence or the Defendant's medical condition in determining whether the Defendant possessed the requisite mental state, i.e., knowingly, during the commission of the alleged offenses."

{¶ 62} The jury subsequently returned guilty verdicts. In light of the evidence here, and the law of Ohio, those verdicts should have been respected.

{¶ 63} The court of appeals, however, reversed. It held that the trial court had improperly instructed the jury that it could not consider any evidence relating to Fulmer's medical condition. In so doing, it overstated the evidence that was before the jury: "[T]he evidence relating to appellant's alleged medical condition was relevant to his defense and probative of whether he could formulate the requisite intent to 'knowingly' assault the officers in question. Further, to the extent the state failed to object to its introduction, we see no basis for excluding it from the jury's deliberations. * * * On cross-examination, defense counsel elicited testimony from Dr. Bligh–Glover that aspirin (i.e., the pills allegedly consumed by appellant), when taken in large enough doses, could impair if not kill an individual. Dr. Bligh–Glover testified that an aspirin overdose could change the body's PH level thereby causing a 'metabolic derangement.' Dr. Bligh–Glover stated that when one is under the stress of metabolic derangement, one's brain 'doesn't work right.'" *State v. Fulmer*, Lake App. No. 2005–L–137, 2006-Ohio-7015, 2006 WL 3833870, ¶ 24.

{¶ 64} The court of appeals went on to conclude that the trial court "overstepped the boundaries of its role by removing uncontested, relevant and probative evidence from the jury's consideration. Testimony indicated that as a result of consuming too much aspirin, appellant may have been biochemically imbalanced, i.e., in the parlance of Dr. Bligh–Glover, appellant may have been 'metabolically deranged.' This evidence is certainly relevant to whether appellant

was capable of formulating the requisite intent to commit the crimes at issue." Id. at ¶ 30.

{¶ 65} The court of appeals is patently wrong.

## ANALYSIS

{¶ 66} Our jurisprudence definitively states that the partial defense of diminished capacity is not recognized in Ohio. *State v. Jackson* (1972), 32 Ohio St.2d 203, 206, 61 O.O.2d 433, 291 N.E.2d 432; *State v. Wilcox* (1982), 70 Ohio St.2d 182, 24 O.O.3d 284, 436 N.E.2d 523, paragraph one of the syllabus.

{¶ 67} In *State v. Wilcox*, we set forth our reasons for not adopting the diminished-capacity defense. We stated that "the diminished capacity theory forcefully challenges conventional concepts of culpability and 'involve[s] a fundamental change in the common law theory of responsibility.'" Id. at 198, 24 O.O.3d 284, 436 N.E.2d 523, quoting *Fisher v. United States* (1946), 328 U.S. 463, 476, 66 S.Ct. 1318, 90 L.Ed. 1382. Thus, when a defendant does not assert an insanity defense, it is well settled that he may not offer expert testimony in an effort to show that he lacked the mental capacity to form the specific mental state required for a particular crime. *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895.

{¶ 68} Despite the clarity of our law, the court of appeals reversed the trial court's decision to exclude the evidence of metabolic derangement from the jury's consideration. It erroneously held that the evidence was relevant and probative.

{¶ 69} Dr. Bligh–Glover's testimony was not relevant to the jury's consideration, because, as the trial court and the dissenting judge on the court of appeals correctly recognized, Ohio law does not permit the jury to consider a defendant's alleged diminished capacity. Here, Fulmer's counsel suggested "a functional equivalent" of a diminished-capacity defense. *State v. Fulmer*, Lake App. No. 2005–L–137, 2006-Ohio-7015, 2006 WL 3833870, ¶ 42 (Westcott Rice, J., dissenting). It was not proper to do so.

{¶ 70} In cases in which a defendant asserts the functional equivalent of a diminished-capacity defense, the trial court should instruct the jury to disregard the evidence used to support that defense unless the defendant can demonstrate that the evidence is relevant and probative for purposes other than a diminished-capacity defense. Here, there was no such showing, and the trial court properly instructed the jury.

{¶ 71} Even if the diminished-capacity defense were viable in Ohio, the evidence before this jury could not support it.

{¶ 72} In *State v. Melchior* (1978), 56 Ohio St.2d 15, 20, 10 O.O.3d 8, 381 N.E.2d 195, we held that in order for a defendant to properly raise an affirmative defense, "'evidence of a nature and quality sufficient to raise the issue must be

introduced, from whatever source the evidence may come.' Evidence is sufficient where a reasonable doubt of guilt has arisen based upon a claim of the defense." Id., quoting *State v. Robinson* (1976), 47 Ohio St.2d 103, 111–112, 1 O.O.3d 61, 351 N.E.2d 88. We expressly cautioned, however, that "[i]f the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." Id. Moreover, the trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction. *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph two of the syllabus.

{¶ 73} Although metabolic derangement is a real condition with real consequences, the evidence did not demonstrate that it occurred here. Thus, the appellate court's conclusion that Dr. Bligh–Glover's general testimony on that condition was "relevant, probative evidence" in this case is also in error.

{¶ 74} Fulmer asserts that the evidence was relevant and probative because "[d]efense counsel was trying to convey to the jury that Mr. Fulmer suffered from a temporary medical condition and because of that medical condition he could not act 'knowingly.'" But Fulmer offered nothing to establish what relevance the alleged "temporary medical condition" would have in the case given that Ohio law does not recognize diminished-capacity defenses and that he did not assert an insanity defense.[1]

{¶ 75} To be probative, the evidence of metabolic derangement had to be linked to Fulmer at the time of his assaults on the officers. No such connection was established at trial. At best, there was only mere possibility, speculation, and surmise that Fulmer may have been suffering from that condition.

{¶ 76} The only witness qualified to render an opinion that Fulmer was afflicted with metabolic derangement was Dr. Bligh–Glover.[2] His testimony on cross-examination provided nothing to the jury other than his acknowledgement

---

1. The trial court found—and Fulmer does not suggest otherwise here—that there was insufficient evidence to sustain a "blackout" instruction to the jury or that his level of cognitive functioning precluded him from acting "knowingly." Nor is there an assertion before us that Fulmer's use of aspirin was the equivalent of a voluntary-intoxication defense that Ohio law sometimes permits. See *State v. Fox* (1981), 68 Ohio St.2d 53, 22 O.O.3d 259, 428 N.E.2d 410, at syllabus.

2. In fn. 3 in its opinion, the court of appeals cited dicta from *Wilcox* in which we noted, " 'Unlike the notion of partial or relative insanity, conditions such as intoxication, medication, epilepsy, infancy, or senility are, in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding.'" *Wilcox*, 70 Ohio St.2d at 194, 24 O.O.3d 284, 436 N.E.2d 523, quoting *Bethea v. United States* (D.C.App.1976), 365 A.2d 64, 88. Although the average juror is likely well aware of the typical effects of aspirin on the body, it is not clear that the average juror—or judge— understands the effects of an overdose of aspirin or metabolic derangement without the aid of a medical or scientific expert.

that metabolic derangement can occur in cases in which a human takes an overdose of aspirin. The only fair interpretation of Dr. Bligh–Glover's testimony—the *sole* evidence upon which the appellate court relied in reversing the verdicts—was that his opinion, to a reasonable degree of medical certainty, was that Fulmer did *not* suffer from metabolic derangement. See *Lally v. Volkswagen Aktiengesellschaft* (1998), 45 Mass.App.Ct. 317, 323–324, 698 N.E.2d 28. Thus, Dr. Bligh–Glover did not support Fulmer's theory of metabolic derangement, and the judge properly instructed the jury not to consider that evidence in determining whether Fulmer had acted knowingly during his assault on the officers.

{¶ 77} Notably, there is not a scintilla of other evidence to support a finding that Fulmer was metabolically deranged at the time of his assault on the officers. His ability to engage three police officers in battle for several minutes, and to cause injury to them, is not consistent with a man who was suffering from acidosis,[3] kidney problems, or any other physical impairment. He did not suggest to the emergency medical personnel or medical staff at the hospital that he was suffering from any symptom indicative of acidosis or kidney dysfunction, nor do his medical records provide any evidence of those afflictions. He was clearly able to hear the officers' commands and to converse, at length, over the phone with his ex-fiancée, and there is no indication in his medical records that his hearing was impaired.

{¶ 78} Upon review of the evidence presented at trial, reasonable minds could only conclude that Fulmer did not establish that he was metabolically deranged or otherwise unable to act "knowingly."

{¶ 79} The court of appeals' decision misconstrued the law of Ohio and its application to the facts of this case. The decision below unfortunately injected doubt into an area of law where there should be none. Accordingly, we reverse the court of appeals' decision and remand this cause to that court to consider Fulmer's remaining claims of error.

Judgment reversed
and cause remanded.

MOYER, C.J., and O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER and LUNDBERG STRATTON, JJ., dissent and would dismiss the appeal as having been improvidently accepted.

---

3. According to Merriam–Webster's Medical Desk Dictionary, acidosis is "an abnormal condition of reduced alkalinity of the blood and tissues that is marked by sickly sweet breath, headache, nausea and vomiting, and visual disturbances." Merriam–Webster's Medical Desk Dictionary (2002) 8.

Charles E. Coulson, Lake County Prosecuting Attorney, and Karen A. Sheppert, Assistant Prosecuting Attorney, for appellant.

R. Paul LaPlante, Lake County Public Defender, and Mandy J. Gwirtz, Assistant Public Defender, for appellee.