OPINION
{¶ 1} Defendant-appellant, Alfred A. Anderson, appeals from the judgment of the Franklin County Court of Common Pleas, whereby a jury convicted appellant of felonious assault with a firearm specification, and whereby appellant pled guilty to having a weapon while under disability.
 {¶ 2} The Franklin County Grand Jury indicted appellant on: (1) one count of attempted murder with a firearm specification, a first-degree felony, in violation of R.C. 2923.02 (as it relates to R.C. 2903.02) and 2941.145, respectively; (2) one count of felonious assault with a firearm specification, a second-degree felony, in violation of R.C. 2903.11 and 2941.145, respectively; and (3) one count of having a weapon while under disability, a third-degree felony, in violation of R.C. 2923.13. The charges stem from appellant shooting Jamile Davis on August 14, 2005.
 {¶ 3} Appellant pled not guilty to the charges, and a jury trial ensued. At trial, Columbus Police Detective David Harrington testified as follows on behalf of plaintiff-appellee, the State of Ohio. On August 14, 2005, Detective Harrington arrived at appellant's house to investigate the shooting of Davis. Inside appellant's house, Detective Harrington saw that Davis was on the ground "suffering what happened to be a gunshot wound to her neck." (Tr. at 27.) Detective Harrington noticed that appellant was "trying to treat [Davis] or keep her conscious[.]" (Tr. at 27.) Detective Harrington tried to ask Davis about what had happened, but Davis was unresponsive. Eventually, medics arrived and transported Davis to the hospital. Later, Detective Harrington went to the hospital to interview Davis. At the hospital, Davis was unable to verbally communicate, and, therefore, Detective Harrington asked Davis "to blink once for yes and twice for no in response to [his] questions." (Tr. at 40.) After interviewing Davis, Detective Harrington concluded that appellant was a suspect in the shooting.
 {¶ 4} Next, during Detective Harrington's direct examination, appellee showed the detective Exhibit 2, a photograph of Davis with an intubation tube. Appellant's trial counsel objected, and the trial court ruled that appellee may only ask whether the photograph "accurately reflect[s] the victim at the time he talked to her." (Tr. at 38.) Thus, appellee asked the question about Exhibit 2 allowed by the trial court, and Detective Harrington responded affirmatively.
 {¶ 5} Detective Harrington further testified that, when he first arrived at the scene of the shooting, appellant stated that "it had been * * * a drive-by style shooting, and * * * the victim had been shot outside[.]" (Tr. at 54.) However, the detective testified that he discounted appellant's explanation because he saw no damage to the exterior of appellant's house.
 {¶ 6} Columbus Police Officer Scott Plate also investigated the August 14, 2005 shooting and testified to the following on appellee's behalf. At appellant's house, Officer Plate saw that Davis had a wound to her neck and was lying on the floor. Appellant "was holding some of the paper towels to [Davis'] neck; [and] appeared to be very upset[.]" (Tr. at 84.) Appellant stated: "`Somebody shot my baby[.]'" (Tr. at 84.) Appellant also "said something along the lines * * * like, `I'll get the guy for this[.]'" (Tr. at 85.) Officer Plate also found a shell casing for a bullet.
 {¶ 7} Columbus Police Officer Troy Hammel also investigated the August 14, 2005 shooting and testified to the following on appellee's behalf. Inside appellant's house, Officer Hammel saw Davis lying on the floor. Davis had a neck injury, and appellant was treating Davis' wound with "some sort of cloth[.]" (Tr. at 111.) Appellant "stated that the shooting happened outside." (Tr. at 112.) However, Officer Hammel found no "bullet casings, no bullet holes, no blood, no evidence of any crime outside the residence." (Tr. at 114.) Officer Hammel did notice a shell casing inside the house.
 {¶ 8} Medic Steve Carna transported Davis to the hospital on August 14, 2005, and testified that, at appellant's house, Carna saw appellant "guarding" Davis while Davis was lying on the floor. (Tr. at 131.) Carna also testified that Davis had a neck wound, her blood pressure was low and her breathing was "labored." (Tr. at 139.) According to Carna, "if we did not do some very quick treatment then [Davis] * * * was possibly going to die because [her] blood pressure was low." (Tr. at 139.)
 {¶ 9} On cross-examination, Carna noted that appellant was angry and that Davis "was a little bit lethargic * * * but she was appropriate * * * with speaking and answering questions[.]" (Tr. at 144.) On re-direct examination, Carna reiterated that, "[i]f we would have not provided proper medical attention, [Davis] would most likely in my opinion died at the scene." (Tr. at 146.)
 {¶ 10} Next, Columbus Police Detective James Porter testified that police executed a search warrant at appellant's house. According to Detective Porter, a .38 caliber revolver was found "inside of a broken washing machine" at the "rear" of appellant's house. (Tr. at 163.) Additionally, Detective Porter identified at trial Exhibit 28 as the firearm that was removed from the washing machine. Detective Porter also testified that police found two spent shell casings at appellant's house and, in particular, one of the shell casings on the floor of appellant's home.
 {¶ 11} Columbus Police Criminalist Heather McClellan testified to the following on appellee's behalf. McClellan previously analyzed Exhibit 28, the .38 caliber firearm, and the spent shell casings that police found at appellant's house. McClellan opined that "the spent [shell] casings received in this case were fired by" the .38 caliber firearm. (Tr. at 199.) On cross-examination, McClellan noted the .38 caliber firearm of this case:
* * * [F]ires both single action and double action. * * * Single action, you cock the hammer manually, and then pull the trigger, and the hammer only falls one direction.
Double action with the pull of the trigger the hammer both cocks and falls forward. * * * So single action is a 3-pound trigger pull. And double action was an 8-pound trigger pull.
(Tr. at 208.)
 {¶ 12} Davis testified to the following on appellee's behalf. Davis dated appellant "off and on for about four years." (Tr. at 220.) Appellant and Davis were not dating on August 14, 2005. On the morning of August 14, 2005, Davis called appellant and they agreed to socialize later that day at appellant's house. Around 2:00 p.m., appellant came to Davis' house to drive Davis and her six-year-old daughter to his house.
 {¶ 13} At appellant's house, Davis took her daughter upstairs to watch television in a bedroom. In the bedroom, Davis saw a firearm "by the fish tank[.]" (Tr. at 227.) Davis put the firearm on the floor because the bed where Davis' daughter was sitting was "real high." (Tr. at 228.) Davis went downstairs and asked appellant about the firearm. Appellant wanted Davis to bring the firearm downstairs. Davis retrieved the firearm, went back downstairs, and "put [the firearm] on the mantle behind a black vase." (Tr. at 228.) Davis verified at trial that Exhibit 28, the .38 caliber firearm, was the firearm that she brought downstairs.
 {¶ 14} Davis then testified to the following. Appellant, Davis, and appellant's friend, Steve Pearson, started to drink alcohol, and appellant and Davis also smoked marijuana. Davis received a call on her cell phone from Rick Currenton, whom she had started to date. After the phone conversation ended, appellant and Davis had a "confrontation" about Currenton because appellant "never liked * * * [Davis] talking to [Currenton] while [she] was" at appellant's house. (Tr. at 234.) The confrontation lasted approximately five minutes before appellant calmed down and continued to drink.
 {¶ 15} Appellant thereafter obtained the firearm and put two bullets in it. Davis asked appellant why he was playing with the firearm, and appellant responded: "[W]ell, you can see where the bullets [are]." (Tr. at 238.) Appellant likes to play with firearms; when "he has company over at the house, he * * * pulls out a gun, [and] shows it to people[.]" (Tr. at 239.)
 {¶ 16} While appellant had the firearm, Davis was "getting kind of scared[,]" and he knew that Davis did not "really like to be around guns[.]" (Tr. at 239-240.) Thus, Davis tried to leave the area where appellant was handling the firearm, but appellant "was right on [her] back." (Tr. at 240.) Davis turned around, and appellant put the firearm "to [her] left side." (Tr. at 240.) Next, "[appellant] put [the firearm] up to [Davis'] neck * * * and [Davis] pushed the gun away the first time." (Tr. at 240-241.) Then:
[Davis] said, "What the fuck are you doing?" And [appellant] just put the gun back, and pow. Everything went deaf. And [Davis was] still looking at [appellant,] [b]ecause [she] was in shock. [Davis] couldn't believe it. It was going through [Davis'] head * * * like [she was] going to die and [her] daughter [was] upstairs. And [Davis thought that appellant] was shocked that he shot [Davis]. And blood started coming out as [Davis was] falling to the floor. [Appellant then stated], "I shot her, Steve. I shot her, Steve." [Appellant also stated], "Baby, don't die on me." * * *
(Tr. at 241.)
 {¶ 17} Thereafter, appellant asked Pearson to hold Davis while appellant called 911. Davis had Pearson "`get a towel and put it up to [her] neck and hold it tight.'" (Tr. at 241.) Shortly thereafter, Davis passed out and later "woke up in the ambulance." (Tr. at 242.) Davis was hospitalized for approximately two months, one month of which was for physical therapy. At trial, appellee asked Davis if Exhibit 2 was a fair and accurate representation of her at the hospital. Appellant's trial counsel objected, and the trial court overruled the objection. However, appellant's trial counsel asked to discuss the matter further, claiming in part that the photograph was "irrelevant to any testimony as to * * * [his] client's guilt or innocence and really only done for effect at this point." (Tr. at 247-248.) The trial court then concluded:
We've already identified and the officer identified that he saw the person at the hospital, and that that person was this witness, and that's how she looked. So I think the identification of that picture to the extent that it's necessary has already been completed for the issue of admissibility. I will deal with the emotion issue later. So I will sustain the objection at this time.
(Tr. at 248.)
 {¶ 18} Davis continued to testify to the following. While at the hospital, police interviewed Davis about the shooting incident, and Davis stated that appellant shot her. Since the shooting, Davis uses an electric wheelchair, and she had previously worn a neck brace. Davis cannot use her legs, and doctors "really don't know if [Davis is] going to be able to walk." (Tr. at 254.) Davis can move her hands, but Davis cannot make a fist. Likewise, Davis is continuing her painful physical therapy.
 {¶ 19} On cross-examination, Davis first testified that she did not think the shooting incident was an accident and noted: "Why would somebody put a gun to somebody's neck at all?" (Tr. at 258.) Later during the cross-examination, appellant's trial counsel asked Davis: "And you don't think this was an accident at all? You think he had to do it on purpose?" (Tr. at 272.) Davis answered: "I don't know." (Tr. at 272.)
 {¶ 20} Further, on cross-examination, Davis reiterated the events of the shooting:
* * * [Appellant] put the gun up to my neck, to the left side of my neck. I smacked the gun away, asked him what he was doing. He put the gun back so quick and pulled the trigger.
(Tr. at 273.)
 {¶ 21} Davis then noted the following on cross-examination. After the shooting, appellant first just "stared. Maybe it looked like he didn't know he shot me until blood start[ed] coming out and I started falling to the ground. And that's when * * * I think he really realized he shot me." (Tr. at 274.) Davis also thought that appellant was really concerned about her after the shooting.
 {¶ 22} Subsequently, appellee sought to admit into evidence its exhibits, including Exhibit 2. Again, appellant's trial counsel objected to the admission of Exhibit 2, but the trial court overruled the objection and admitted the exhibit into evidence. Next, the parties stipulated that appellant was previously convicted of attempted abduction, a felony.
 {¶ 23} Appellant then testified to the following on his own behalf. On August 14, 2005, appellant socialized with Davis at his home. Pearson was also at appellant's home because appellant hired him to clean. The individuals started to drink alcohol, and, in the course of events, Davis asked appellant why he kept a firearm upstairs. Appellant denied that there was a firearm upstairs, and Davis showed appellant the firearm and placed the firearm on the mantle. The firearm belonged to appellant's friend, Davey Scott, who had been staying with appellant for a week and had slept in appellant's bedroom.
 {¶ 24} Thereafter, appellant retrieved the firearm. Initially, appellant did not think that the firearm was loaded, but appellant eventually saw bullets in the firearm. Thus, appellant "let [Davis] know that [the firearm] was loaded" given "the way she was carrying it downstairs." (Tr. at 308.) Appellant then "opened [the firearm] up and spinned it." (Tr. at 312.) Appellant also "took one of the shells out" of the firearm and showed it to Davis before putting the shell back in the firearm. (Tr. at 312.)
 {¶ 25} Appellant acknowledged that Davis received a phone call from Currenton, but stated that he did not become upset about the call. Afterwards, Davis said that she was going to use the bathroom, and appellant followed her because they had been caressing each other throughout the day, and appellant "was going to play with her for a little bit." (Tr. at 315.) Appellant was only "about two steps" behind Davis, and appellant was holding the firearm "to the light" and "spinning" the firearm. (Tr. at 320, 318.) Thereafter:
* * * [Appellant] was going to take [the firearm] and put it * * * out [of] the way. In the process while [Davis] was going, she [forgot] that [appellant] was standing behind her.
* * *
[Davis] turned around and she jumped. * * * [Davis] hit [appellant's] hand and the gun went off.
* * *
* * * [Davis] said, "Baby, I've been hit." And [appellant] dropped the gun on the ground. And [appellant] grabbed [Davis]. [Appellant] laid [Davis] on the couch. [Appellant] said, "Baby, don't die on me, please don't die." Then [appellant] picked [Davis] up. [Appellant] called [Pearson]. [Appellant] told [Pearson to] hand [appellant] the phone. [Appellant] called 911 several times. And [appellant] carried [Davis] into the other room and laid her in [his] lap. And [appellant] was just sitting there holding [Davis] and told her, "Don't die, man."
(Tr. at 318-319.) After the shooting, appellant "was stunned for a minute." (Tr. at 320.) While tending to Davis after the shooting, appellant put ice and a rag on Davis' wound.
 {¶ 26} Appellant stated that he did not intend to shoot Davis, and he did not think that such a shooting "could happen" from him playing with the firearm. (Tr. at 322.) Prior to the shooting, appellant had not been arguing or screaming with Davis.
 {¶ 27} On cross-examination, appellant admitted that he and Davis smoked marijuana on August 14, 2005. Appellant also testified that he is familiar with firearms and that he had previously shot firearms. Appellant also testified on cross-examination that, when he was handling the firearm on August 14, 2005, he had his finger "on the trigger in a position from which [he] can fire it[.]" (Tr. at 348.) Additionally, appellant verified on cross-examination that, to discharge the firearm, one would "[s]queeze the trigger." (Tr. at 350.) Next, appellant acknowledged that the firearm he was handling was in "double action" mode that took eight pounds of pressure to pull the trigger. (Tr. at 350.) However, on cross-examination, appellant denied that he held the firearm to Davis' neck.
 {¶ 28} On re-direct examination, appellant testified that Davis also brought a shell casing downstairs with her. Appellant then threw the shell casing on the floor for "no reason." (Tr. at 371.)
 {¶ 29} Afterwards, during the trial, appellant pled guilty to the having a weapon while under disability charge, and the trial court accepted the guilty plea. Thereafter, during closing argument, appellee mentioned appellant's prior felony conviction for attempted abduction, and appellee noted that the jury could consider the conviction when analyzing appellant's credibility.
 {¶ 30} Before the jury deliberated, the trial court provided jury instructions. The trial court instructed the jury, in pertinent part, on felonious assault by stating:
* * * Before you can find the defendant guilty of felonious assault, you must find beyond a reasonable doubt that on or about the 14th day of August, 2005, in Franklin County, Ohio, [appellant] knowingly caused serious physical harm to Jamile Davis and/or caused or attempted to cause physical harm to Jamile Davis by means of a deadly weapon, to wit, a firearm.
(Tr. at 497.) However, the trial court declined to give appellee's requested jury instruction on negligent assault as a lesser-included offense to felonious assault.
 {¶ 31} Ultimately, the jury found appellant not guilty of attempted murder, but guilty of felonious assault and the accompanying firearm specification. On January 25, 2006, the trial court held a sentencing hearing. Applying Ohio's felony sentencing statutes, the trial court declined to impose the minimum authorized prison sentence for the felonious assault conviction upon noting that "the shortest term does not adequately protect the public" and "the shortest term would demean the seriousness of the offense." (Tr. at 536.) Rather, the trial court imposed the maximum eight-year prison sentence for the felonious assault conviction upon determining that appellant "will commit crimes again" and that appellant committed the "worst form of felonious assault[.]" (Tr. at 537.) The trial court imposed a concurrent two-year prison sentence on the having a weapon under disability conviction, and, on the firearm specification that accompanied the felonious assault conviction, the trial court imposed a one-year prison sentence to be served consecutive with the other sentences.
 {¶ 32} Appellant appeals, raising four assignments of error:
Assignment of Error One
THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT BY ALLOWING A PHOTOGRAPH OF THE VICTIM TO BE SHOWN TO THE JURY AND ADMITTED INTO EVIDENCE WHERE THE DANGER OF UNFAIR PREJUDICE SUBSTANTIALLY OUTWEIGHED THE PHOTOGRAPH'S PROBATIVE VALUE.
Assignment of Error Two
THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF NEGLIGENT ASSAULT.
Assignment of Error Three
THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT TO A MAXIMUM SENTENCE BASED UPON FACTS NOT FOUND BY A JURY OR ADMITTED BY APPELLANT.
Assignment of Error Four
THE JURY VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 33} In his first assignment of error, appellant argues that the trial court erred by admitting into evidence Exhibit 2, the photograph of Davis intubated at the hospital. We disagree.
 {¶ 34} Evid.R. 403 provides:
(A) Exclusion mandatory
Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
(B) Exclusion discretionary
Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.
The admission of photographs is left to the trial court's sound discretion. State v. Monroe, 105 Ohio St.3d 384,2005-Ohio-2282, at ¶ 21. An abuse of discretion connotes more than an error of law or judgment; it entails a decision that is unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 35} Here, appellant argues that the prejudicial nature of Exhibit 2 outweighed its probative value because the photograph had no relevance to any contested issue. Specifically, according to appellant, Exhibit 2 was not relevant to whether appellant had the requisite mental state to commit the charged crimes, and appellee had no need to use the photograph to reveal the extent of Davis' injuries, given that Davis appeared in court to display and describe her injuries. However, the photograph depicted Davis' overall condition soon after the shooting and, therefore, properly provided the jury an "appreciation of the nature and circumstances of the crimes." See State v. Evans (1992),63 Ohio St.3d 231, 251. Accordingly, we conclude that the probative value of Exhibit 2 was not outweighed by appellant's claimed prejudicial nature of the photograph. Thus, the trial court did not abuse its discretion by admitting into evidence Exhibit 2, and we overrule appellant's first assignment of error.
 {¶ 36} In his second assignment of error, appellant asserts that the trial court erred when it denied appellant's request for a jury instruction on negligent assault as a lesser-included offense of felonious assault. We disagree.
 {¶ 37} Here, the trial court instructed the jury on the two alternative aspects of felonious assault defined in R.C. 2903.11, which states that:
(A) No person shall knowingly do either of the following:
(1) Cause serious physical harm to another or to another's unborn;
(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.
R.C. 2903.14(A) defines negligent assault and states that "[n]o person shall negligently, by means of a deadly weapon or dangerous ordnance * * * cause physical harm to another or another's unborn."
 {¶ 38} We have previously held that "negligent assault, as defined by R.C. 2903.14, is a lesser included offense of felonious assault pursuant to R.C. 2903.11(A)(2)[.]" State v.Jackson (Dec. 8, 1994), Franklin App. No. 94APA04-531; State v.Smith (Apr. 25, 1989), Franklin App. No. 88AP-89.
 {¶ 39} Nonetheless, an instruction on a lesser-included offense is required only when the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense. State v.Carter (2000), 89 Ohio St.3d 593, 600. The trial court considers the prosecution's evidence, as well as the defense's evidence, in deciding whether to provide a lesser-included offense instruction. State v. Collins (Sept. 24, 1980), Montgomery App. No. CA 6418. Thus, we next determine whether the evidence at trial here would reasonably support both an acquittal for felonious assault and a conviction for negligent assault. As noted above, felonious assault requires a knowing mental state, and negligent assault requires a negligent mental state.
 {¶ 40} According to R.C. 2901.22(B):
A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
 {¶ 41} Conversely, according to R.C. 2901.22(D):
A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that such circumstances may exist.
 {¶ 42} Knowledge is a state of mind that must be proved from the surrounding facts and circumstances. State v. Dotson (Nov. 21, 1997), Clark App. No. 97-CA-0071. Here, appellant admitted that he was familiar with firearms and that he had previously shot firearms. Appellant also admitted that he carried a loaded firearm while standing very near Davis and that he had his finger on the trigger "in a position from which [he] can fire it[.]" (Tr. at 348.) Indeed, appellant did more than hold his finger on the trigger while standing near Davis; appellant established that he ultimately pulled the trigger given his admission that: (1) he had to have squeezed the trigger in order for the firearm to have discharged; and (2) the firearm was in "double action" mode, requiring as much as eight pounds of pressure to pull the trigger. (Tr. at 350.) Through appellant's above admissions, a jury could have reasonably inferred that appellant was aware that his conduct would have probably caused a certain result, and thus concluded that appellant possessed the knowing mental element for felonious assault rather than the negligent mental element for negligent assault, given Davis' claim that appellant shot the firearm while holding it to her neck. Even under appellant's version of events, the above-noted circumstances allowed the jury to reasonably infer that appellant was aware that his conduct would have probably caused a certain result, and thus conclude that appellant possessed the knowing mental element for felonious assault rather than the negligent mental element for negligent assault, given that appellant stood very near Davis with his finger on the firearm's trigger while Davis, predictably, pushed the firearm away. Accordingly, we conclude that the evidence at trial does not reasonably support both an acquittal for felonious assault and a conviction for negligent assault.
 {¶ 43} In concluding as such, we find it irrelevant that appellant may not have intended to cause Davis' physical injuries. The mental element of knowledge does not require an inquiry into the purpose for an act, but, as noted above, involves the question of whether an individual is aware that his or her conduct will probably cause a certain result or will probably be of a certain nature. See State v. Perkins (Mar. 27, 1998), Portage App. No. 96-P-0221.
 {¶ 44} Therefore, based on the above, we conclude that the trial court did not err when it denied appellant's request for a jury instruction on negligent assault as a lesser-included offense to felonious assault. As such, we overrule appellant's second assignment of error.
 {¶ 45} We next address appellant's third assignment of error, wherein appellant contends that the trial court erred by sentencing appellant to the maximum authorized prison sentence for his felonious assault conviction instead of the minimum authorized prison sentence. In particular, appellant asserts that the trial court imposed the sentence in violation of jury trial principles afforded by the Sixth Amendment to the United States Constitution and in contravention of Blakely v. Washington
(2004), 542 U.S. 296, and State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856.
 {¶ 46} Blakely stems from Apprendi v. New Jersey (2000),530 U.S. 466, 490, wherein the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. Otherwise, the sentence violates a defendant's right to a jury trial under the Sixth Amendment to the United States Constitution and Fourteenth Amendment due process guarantees. Apprendi at 476-478, 497. In Blakely, the United States Supreme Court defined "`statutory maximum' forApprendi purposes" as "the maximum sentence a judge may imposesolely on the basis of the facts reflected in the jury verdictor admitted by the defendant." (Emphasis sic.) Blakely at 303.
 {¶ 47} Since appellant's sentencing, the Ohio Supreme Court decided the applicability of Blakely to Ohio's felony sentencing laws in Foster. In Foster, the Ohio Supreme Court concluded that portions of Ohio's felony sentencing statutes violate the Sixth Amendment to the United States Constitution in the manner set forth in Blakely. Foster at ¶ 50-83. In particular, the Ohio Supreme Court declared unconstitutional the statutes involved in appellant's case: (1) R.C. 2929.14(B), a statute governing a trial court's decision not to impose the minimum authorized prison sentence for felonious assault; and (2) R.C. 2929.14(C), a statute governing the trial court's decision to impose the maximum authorized prison sentence for felonious assault. See Foster at ¶ 83. Thus, in Foster, the Ohio Supreme Court severed the unconstitutional statutes from Ohio's felony sentencing laws. Id. at ¶ 99. The Ohio Supreme Court then concluded that cases pending on direct review "must be remanded to trial courts for new sentencing hearings[.]" Id. at ¶ 104.
 {¶ 48} In State v. Draughon, Franklin App. No. 05AP-860,2006-Ohio-2445, at ¶ 7, we acknowledged the "broad language the Supreme Court of Ohio used in Foster when it ordered resentencing for all cases pending on direct review." However, we concluded that "a defendant who did not assert a Blakely
challenge in the trial court waives that challenge and is not entitled to a resentencing hearing based on Foster." Id. In concluding as such, we "consider[ed] the language used in UnitedStates v. Booker (2005), 543 U.S. 220, 125 S.Ct. 738, the case that Foster relied on in arriving at" its decision to sever the unconstitutional statutes from Ohio's felony sentencing laws.Draughon at ¶ 7. "In Booker, the United States Supreme Court applied Blakely to the Federal Sentencing Guidelines. TheBooker Court applied its holding to all cases on direct review." Draughon at ¶ 7. However, the Booker court "expected reviewing courts to apply `ordinary prudential doctrines,' such as waiver * * * to determine whether to remand a case for a new sentencing." Draughon at ¶ 7, quoting Booker at 268. "Thus, in accordance with the well-settled doctrine of waiver of constitutional challenges, and the language in Booker, we [held] that a Blakely challenge is waived by a defendant sentenced after Blakely if it was not raised in the trial court." Draughon at ¶ 8; see, also, Washington v. Recuenco
(2006), ___ U.S. ___, 126 S.Ct. 2546 (holding that constitutional error under Blakely does not provide for automatic reversal).
 {¶ 49} Here, the trial court sentenced appellant after the United States Supreme Court issued Blakely. Thus, appellant could have objected to his felonious assault sentence based onBlakely and the constitutionality of Ohio's sentencing scheme. Appellant did not do so. Therefore, pursuant to Draughon, we conclude that appellant waived his Blakely argument on appeal in regards to his felonious assault sentence and is not entitled to a resentencing hearing based on Foster. See Draughon at ¶ 7.
 {¶ 50} Next, in his third assignment of error, appellant contends that Foster created an ex post facto change in Ohio's felony sentencing statutes in violation of Section 10, Article I, and the Fourteenth Amendment to the United States Constitution. In support, appellant argues that Foster retroactively exposes a defendant to increased penalties for offenses committed prior to the Ohio Supreme Court decision. However, we find that appellant's ex post facto argument is not properly before us and is not dispositive here given our above conclusion that appellant is not entitled to a resentencing hearing. See State v.Hardesty, Pickaway App. No. 06CA1, 2006-Ohio-5272, at ¶ 10 (declining to address an ex post facto argument not properly before the court). Thus, we decline to address appellant's ex post facto argument, and we note that any decision here on the ex post facto argument would amount to an improper advisory opinion. Id.; Cook v. Criminger, Summit App. No. 22313, 2005-Ohio-1949, at ¶ 25. Accordingly, based on the above, we overrule appellant's third assignment of error.
 {¶ 51} In his fourth assignment of error, appellant contends that his felonious assault conviction is against the manifest weight of the evidence. We disagree.
 {¶ 52} In determining whether a verdict is against the manifest of the evidence, we sit as a "`thirteenth juror.'"State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'"Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 53} Here, appellant argues that the weight of the evidence establishes that the shooting incident was a tragic accident and that appellant did not have the knowing mental culpability to commit felonious assault. In support, appellant notes the following: (1) there was no evidence that appellant made threats against Davis; (2) Davis testified that she could not discount the possibility that the shooting was accidental; (3) appellant testified that he did not intend to shoot Davis and that he was stunned after the shooting; (4) Davis testified that, after the shooting: "At first [appellant] stared. Maybe it looked like he didn't know he shot me until blood start[ed] coming out and I started falling to the ground. And that's when * * * I think he really realized he shot" Davis; and (5) undisputed evidence established that appellant attempted to assist Davis after the shooting, appellant called 911 immediately after the shooting, and, after the shooting, appellant cried out to Davis, "Baby, don't die on me." (Tr. at 274, 241.)
 {¶ 54} However, we have already concluded above that, upon considering the totality of the circumstances of the shooting, the jury could have properly inferred that appellant possessed the requisite knowing mental culpability for felonious assault under either Davis' or appellant's version of events. Similarly, we reiterate that, while appellant may not have intended the results of the shooting, felonious assault has a knowing mental element, and knowledge does not require an inquiry into the purpose for an act. See Perkins.
 {¶ 55} In addition to our above-noted conclusions, we note that the jury had cause to discount as incredible appellant's testimony, which included appellant's claims that he did not have the requisite knowing mental culpability for felonious assault, given that he previously provided to police inconsistent accounts as to how Davis was shot and given that, pursuant to Evid.R. 609, appellee impeached appellant's credibility with his prior felony conviction. Moreover, we note that the jury could infer appellant's consciousness of guilt from the fact that the firearm from the shooting was concealed on his property. See State v.Williams (1997), 79 Ohio St.3d 1, 11.
 {¶ 56} Accordingly, we conclude that appellant's felonious assault conviction is not against the manifest weight of the evidence, and we overrule appellant's fourth assignment of error.
 {¶ 57} In summary, we overrule appellant's first, second, third, and fourth assignments of error. As such, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Bryant and Brown, JJ., concur.