[Cite as *State v. Rutledge*, 2019-Ohio-3460.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

       Plaintiff-Appellee,                  :                No. 17AP-590
                                                                                    (C.P.C. No. 16CR-2072)
v.                                                     :

Lincoln S. Rutledge,                        :                (REGULAR CALENDAR)

       Defendant-Appellant.               :

D E C I S I O N

Rendered on August 27, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee. **Argued:** *Steven L. Taylor.*

**On brief:** *Timothy Young*, Ohio Public Defender, *Stephen P. Hardwick*, and *Allen Vender*, for appellant. **Argued:** *Stephen P. Hardwick.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Lincoln S. Rutledge, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of aggravated murder, felonious assault, attempted murder, and aggravated arson. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} By indictment filed June 7, 2016, plaintiff-appellee, State of Ohio, charged Rutledge with one count of aggravated arson in violation of R.C. 2909.02, a second-degree felony; one count of aggravated murder in violation of R.C. 2903.01, an unclassified felony; one count of aggravated murder of a police officer in violation of R.C. 2903.01(E), an unclassified felony; four counts of attempted murder in violation of R.C. 2923.02 and

2903.02, first-degree felonies; and four counts of felonious assault in violation of R.C. 2903.11, first-degree felonies.  The indictment also contained capital specifications for killing a law enforcement officer, killing during a course of conduct involving the purposeful killing or attempt to kill two or more persons, and killing for the purpose of escaping detection, apprehension, trial, or punishment for aggravated arson.  Additionally, all of the counts except aggravated arson included a 7-year specification for discharging a firearm at a peace officer and a 3-year specification for the use of a firearm.  The charges related to the shooting death of Steven M. Smith, a SWAT officer with the Columbus Police Department, as well as the attempted murder of four other police officers.  Rutledge entered a plea of not guilty.

{¶ 3}   At the trial beginning June 2, 2017, the evidence indicated that on April 8, 2016, Rutledge's wife, Jennifer Young, informed Rutledge that he could come to her home that weekend to pick up some of his items.  Rutledge and Young were separated at the time, and she was out of town but had friends house sitting for her who would be able to give Rutledge access to the house.  Rutledge replied by email, demanding that she give him money, and writing:

> If you back me into a corner where it's my life or your bullshit,
> what choice do you think I will have to make?  There is no
> choice.  I have to survive.  I'll get what's mine with a fountain
> pen or gun.  You can take that to heart.  There is nowhere for
> you to hide.

 (Tr. at 1293.)

{¶ 4}   After receiving Rutledge's threatening email, Young called her house sitters and asked them to leave her house and take her dog to another location.  The house sitters left Young's house on the morning of April 9, 2016 and locked the house.  Rutledge arrived at Young's house after the house sitters had left, and surveillance video from a nearby parked car showed Rutledge go around to the back of the house.  One of Young's neighbors also saw Rutledge at the back of Young's house.  The surveillance video then showed Rutledge drive away, and, approximately 28 minutes later, it showed smoke coming from Young's home.  Firefighters arrived on the scene to extinguish the fire.  A subsequent investigation found the fire was purposely set with the aid of an ignitable liquid, and investigators noted an odor of gasoline in the bedroom.

{¶ 5}  That same day, fire investigators were able to review the surveillance video from the nearby parked vehicle.  The video led police to obtain an arrest warrant for Rutledge at 10:34 p.m. and a search warrant for his residence at 11:15 p.m.

{¶ 6}  SWAT officers from the Columbus Police Department were waiting at Rutledge's address, 14 West California, to execute the warrants.  The officers knocked loudly and announced their presence as police.  The officers continued to knock for at least 20 minutes.  Although Rutledge did not respond to the knocking at his door, the SWAT officers surrounding the residence could see the silhouette of someone moving inside turning off a light and attempting to hide.

{¶ 7}  The SWAT officers determined that it was a barricade situation and called for all SWAT officers to report to the scene.  Police used a loudspeaker system from one of their vehicles to advise Rutledge that they were the Columbus Police and were outside his home.  Further, police advised Rutledge that they were not going to hurt him and that they wanted him to come outside peacefully.  As part of their announcement over the loudspeaker, police repeatedly stated "There is a warrant for your arrest.  You need to exit the premises immediately."  (Tr. at 1567.)  A neighbor in an adjacent building testified he could hear the repeated police announcements.  In the darkness of the apartment, police could see that Rutledge was flickering a lighter.

{¶ 8}  While the SWAT officers were outside repeatedly asking for Rutledge to surrender, Rutledge was located in the back bedroom of his apartment.  Officer Dennis Prestel and Officer Troy Palmer were able to gain access to the basement directly underneath the back bedroom of Rutledge's apartment. The SWAT officers decided to turn off the electricity to the apartment through the circuit breaker box in the basement and were communicating their plan through their police radios when Rutledge fired a gun down through the floor in the direction where the officers were located. The bullet grazed Officer Palmer's ballistic vest.  Officers Prestel and Palmer could see the dust settle from the shot directly above them.

{¶ 9}  The SWAT officers decided to breach the front door of Rutledge's residence, and they did so by ramming it open.  Officer Charles Distelhorst and Officer Tim O'Donnell took positions at the breached front door and repeatedly yelled "Columbus police, SWAT.  We are outside.  We are not leaving.  We have a warrant for your arrest.  You need to make

yourself known inside the house."  (Tr. at 1864.)  Rutledge responded by saying "I'm not coming out.  Stay out of my house.  Do not come in here."  (Tr. at 1865-66.)

{¶ 10} Minutes after those announcements, Rutledge began firing a number of gunshots at the group of officers by putting his arm around the corner of the bedroom doorway and firing his weapon, a mid-sized black handgun.  As he fired these four or five shots, Rutledge was screaming "Get the fuck out of my house."  (Tr. at 1948.)

{¶ 11} Officer Distelhorst then yelled at Rutledge to "[q]uit shooting," telling him he was "making this way worse than it has to be."  (Tr. at 1948.)  Rutledge told the officers he was invoking the Castle doctrine, and Officer Distelhorst tried to explain to Rutledge that the Castle doctrine would not apply to his current situation since the officers had a warrant for his arrest.   Officer Distelhorst repeatedly pleaded with Rutledge to put down his gun and show his hands to be taken into custody.  Rutledge responded by saying, "You fucking pussy, why don't you come in here and get me?"  (Tr. at 1965.)

{¶ 12} As the stand-off continued, police sent two robots through the front door to assess the situation.  Rutledge fired shots at the robots and disabled both of them.  The SWAT officers then introduced tear gas and knee-knockers through the back bedroom window, but Rutledge still did not surrender.

{¶ 13} Eventually, the SWAT officers decided to use a camera to attempt to see into the back bedroom.  The officers used a "Bearcat" armored vehicle, planning to drive it as close as possible to the back bedroom window.  Officer Enoch White was driving the vehicle, and Officer Smith was positioned atop the vehicle, standing upright through a turret and using the opened hatch to provide partial cover.  Officer Smith had his rifle in order to provide cover for the officers who were on foot.  The officers planned for Officer David Thivener to use a pole to clear out the glass and blinds still obscuring the window, at which point Sergeant Scott Bray was to extend the camera on a pole through the window.

{¶ 14} When Officer Thivener began to use the pole to clear out the window, Rutledge fired his gun between five to ten times and was screaming, "Come and get me, you fucking pussies."  (Tr. at 1664.)  From his vantage point inside the armored vehicle, Officer White could see the muzzle flashes from Rutledge's gun being fired methodically from a low position in the bedroom, aimed toward the armored vehicle.  Officer White could hear shots hit the armored vehicle, including the windshield where he was positioned, and then

another shot hit Officer Smith in the head. After realizing Officer Smith had been shot, Officer Thivener came around to the back of the armored vehicle to drag Officer Smith away to a location where he could receive medical treatment. Officer Smith was transported to a hospital where he died from the gunshot wound to his head.

{¶ 15} Based on the pattern of bullet shots on the armored vehicle, Officer White thought the shot marks were consistent with Rutledge "walking up" the shots by taking an initial shot and subsequently adjusting his aim until reaching the top of the vehicle where Smith was exposed. Officer White explained that "walking up" is a targeting method known to people familiar with weapons. (Tr. at 2036.)

{¶ 16} The standoff continued for several more hours, and Rutledge fired off occasional gunshots during that time. Officer Thivener attempted to return fire at Rutledge several times and hit him in the arm, but Rutledge still did not surrender. Eventually, a fire ignited inside the apartment but Rutledge still refused to surrender to police. Ultimately, after 7:00 a.m. on April 10, 2016, the SWAT officers set off a charge on a window to the bathroom, where Rutledge was lying in the bathtub, at which point Rutledge surrendered and stated, "I'm done." (Tr. at 1934.)

{¶ 17} Following deliberations, the jury returned guilty verdicts on all counts and accompanying specifications of aggravated murder. The jury additionally returned guilty verdicts on the felonious assault and attempted murder charges that related to Officers Thivener and White. The jury returned not-guilty verdicts on the attempted murder charges that related to Officers Prestel and Palmer, but the jury found Rutledge guilty of the felonious assault charges related to these two officers. Additionally, the jury convicted Rutledge of the accompanying firearm specifications attached to each of his convictions.

{¶ 18} The case then proceeded to the penalty phase. After the jury could not reach a unanimous decision as to whether to authorize a death sentence, the jury recommended a sentence of life without parole. Following a July 18, 2017 sentencing hearing, the trial court imposed an aggregate sentence of life without parole plus 66 years in prison. Rutledge timely appeals.

## II.  Assignments of Error

{¶ 19}  Rutledge assigns the following error for our review:

[1.] The trial court abused its discretion when it denied Mr. Rutledge's request for an instruction on the lesser-included offense of reckless homicide.

[2.] The trial court erred when it instructed the jury that it was not allowed to consider evidence of mental illness in relation to Lincoln's mental state.

[3.] Trial counsel was ineffective for failing to proffer specific mental health diagnoses at the trial phase.

[4.] In response to a juror question, the trial court abused its discretion by incorrectly lowering the State's burden to prove that Lincoln Rutledge knowingly caused or attempted to cause physical harm to officers Prestel and Palmer.

## III.  First Assignment of Error – Lesser-Included Offense

{¶ 20}  In his first assignment of error, Rutledge argues the trial court erred in refusing to instruct the jury on the lesser-included offense of reckless homicide in regard to the aggravated murder charges.

{¶ 21} This court reviews a trial court's refusal to instruct the jury on a lesser-included offense under the abuse of discretion standard. *State v. Coleman-Muse*, 10th Dist. No. 15AP-566, 2016-Ohio-5636, ¶ 8; *State v. Parnell*, 10th Dist. No. 11AP-257, 2011-Ohio-6564, ¶ 21-27. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Clark*, 71 Ohio St.3d 466, 470 (1994); *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 22} Here, the indictment charged Rutledge with one count of aggravated murder and one count of aggravated murder of a law enforcement officer. Aggravated murder, as defined in R.C. 2903.01(A) provides in part "[n]o person shall purposely, with prior calculation and design, cause the death of another." Similarly, aggravated murder of a law enforcement officer, as defined in R.C. 2903.01(E), provides "[n]o person shall purposely cause the death of a law enforcement officer whom the offender knows or has reasonable cause to know is a law enforcement officer" when either "[t]he victim, at the time of the

commission of the offense, is engaged in the victim's duties," or "[i]t is the offender's specific purpose to kill a law enforcement officer." The trial court instructed the jury on the lesser-included offense of felony murder based on Rutledge proximately causing Smith's death as a result of committing felonious assault. As defined in R.C. 2903.02(B), the offense of felony murder provides "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."

{¶ 23} Despite the trial court's instruction on the lesser-included offense of felony murder, the jury returned guilty verdicts on both of the aggravated murder charges and accompanying specifications. Nonetheless, Rutledge argues the trial court erred when it did not instruct the jury on the additional lesser-included offense of reckless homicide. Pursuant to R.C. 2903.041, the offense of reckless homicide provides "[n]o person shall recklessly cause the death of another." In turn, R.C. 2901.22(C) provides "[a] person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature."

{¶ 24} The state concedes, and we agree, that reckless homicide is a lesser-included offense of aggravated felony murder. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 190 ("reckless homicide is a lesser included offense of aggravated felony murder"); *State v. Anderson*, 12th Dist. No. CA2005-06-156, 2006-Ohio-2714, ¶ 9 ("[r]eckless homicide is a lesser included offense of aggravated murder"). However, an instruction on a lesser-included offense is required only when the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense. *State v. Anderson*, 10th Dist. No. 06AP-174, 2006-Ohio-6152, ¶ 39, citing *State v. Carter*, 89 Ohio St.3d 593, 600 (2000); *see State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, ¶ 34 (a trial court "must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense").

{¶ 25} In deciding whether to provide a lesser-included offense instruction, the trial court must consider both the state's evidence and the defense's evidence, and it must view the evidence in the light most favorable to the defendant. *Anderson*, 2006-Ohio-6152, at

¶ 39; *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 37. An instruction on a lesser-included offense is not warranted, however, every time "some evidence" is presented to support the lesser offense. *State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 84. The court must find "sufficient evidence" to allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser-included, or inferior degree, offense. *Id.* For example, "a defendant's own testimony that he did not intend to kill his victim does not entitle him to a lesser-included offense instruction 'if the evidence on whole does not reasonably support an acquittal on the murder offense and a conviction on a lesser offense.' " *Id.*, quoting *State v. Willis*, 8th Dist. No. 99735, 2014-Ohio-114, ¶ 51.

{¶ 26} The issue, therefore, is whether the evidence presented at trial supported both an acquittal as to the charged offense of aggravated murder and a conviction for reckless homicide. A key distinction between the offenses of aggravated murder and reckless homicide is that aggravated murder requires a purposeful mental state, whereas a reckless mental state is sufficient to establish reckless homicide. *Trimble* at ¶ 190. "A person acts purposely when it is the person's specific intention to cause a certain result," while "[a] person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.11(A) and (C).

{¶ 27} On appeal, Rutledge asserts the evidence supported an instruction on reckless homicide on the theory that the harsh lighting, tear gas, and breaching tactics used by police could have startled him and caused him to recklessly fire off warning shots. However, according to the evidence presented at trial, Rutledge fired his gun methodically in a "walking up" pattern up the armored vehicle until one of his shots hit Officer Smith. As he was engaging the police in gunfire, he was screaming at the SWAT officers to "come and get" him, taunting them as he did so. Prior to shooting and killing Officer Smith, Rutledge had also fired his gun through the floor boards down into the basement where officers were staged, and he fired at officers when they attempted to breach the front door, using tactical positioning and screaming at officers to get out of his house. The officers had continually and repeatedly announced their presence at the scene and attempted to coax Rutledge out of the house peacefully. As the trial court noted, Rutledge knew the officers outside were people, and he repeatedly shot at groups of people throughout the course of the entire

SWAT situation. Thus, on this record, there was no reasonable basis for the jury to find that Rutledge did not fire his weapon purposely toward the officers but instead recklessly fired his gun after being startled by the actions of the SWAT officers. *See Trimble* at ¶ 193-96; *State v. Hubbard*, 10th Dist. No. 11AP-945, 2014-Ohio-122, ¶ 17 (defendant not entitled to instruction on reckless homicide despite his assertion that he only meant to fire warning shots and did not intend to hurt anyone because evidence at trial demonstrated that defendant fired his gun in the direction of a group of people and injured two separate people in that group).

{¶ 28} We also note that the trial court did instruct the jury on the lesser-included offense of felony murder. Thus, if the jurors had any doubt about Rutledge's purpose to kill but were reluctant to acquit, they could have found Rutledge guilty of felony murder. However, the jury chose to find Rutledge guilty of aggravated murder. Under these circumstances, it is unlikely that the jury would have found Rutledge guilty of the even less culpable crime of reckless homicide. *Trimble* at ¶ 197 (noting any error in failing to instruct on lesser-included offense is harmless error where the jury had the option to convict of a less culpable offense but instead chose to convict on the more culpable offense), citing *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 139.

{¶ 29} Because the evidence at trial did not reasonably support both an acquittal for aggravated murder and a conviction for reckless homicide, the trial court did not abuse its discretion in declining to instruct the jury on reckless homicide. Therefore, we overrule Rutledge's first assignment of error.

## IV. Second Assignment of Error — Evidence of Mental Illness

{¶ 30} In his second assignment of error, Rutledge argues the trial court erred when it instructed the jury that it was not allowed to consider evidence of mental illness in relation to his mental state. More specifically, Rutledge argues the trial court erred in instructing the jury regarding evidence of mental illness because he was not attempting to present a diminished capacity defense and instead sought to use evidence of mental illness as one factor for the jury to consider in deciding whether Rutledge had the requisite mental state to be found guilty.

{¶ 31} Generally, the trial court has discretion to decide to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of

discretion. *State v. Teitelbaum*, 10th Dist. No. 14AP-310, 2016-Ohio-3524, ¶ 127, citing *Clark v. Grant Med. Ctr.*, 10th Dist. No. 14AP-833, 2015-Ohio-4958, ¶ 50. However, when a jury instruction contains an incorrect statement of the law, a reviewing court applies a mixed de novo and abuse of discretion standard of review. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 21, citing *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995). Thus, "[i]n examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' " *Kokitka* at 93, quoting *Becker v. Lake Cty. Mem. Hosp. West*, 53 Ohio St.3d 202, 208 (1990).

{¶ 32} As the Supreme Court of Ohio has repeatedly held, "the partial defense of diminished capacity is not recognized in Ohio." *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, ¶ 66, citing *State v. Jackson*, 32 Ohio St.2d 203, 206 (1972); *State v. Wilcox*, 70 Ohio St.2d 182 (1982), paragraph one of the syllabus. Thus, where a defendant does not pursue an insanity defense, Ohio law is well-settled that the defendant may not offer testimony "in an effort to show that he lacked the mental capacity to form the specific mental state required for a particular crime." *Fulmer* at ¶ 67, citing *State v. Gooey*, 46 Ohio St.3d 20, 26 (1989).

{¶ 33} At trial, there were several occasions when evidence of mental illness was either introduced or attempted to be introduced, including testimony from Young about her concerns about Rutledge's mental health and testimony indicating that the police radio call about Rutledge suggested the situation involved mental health issues. During the presentation of evidence, the trial court instructed the jury:

> I'm going to give you an instruction of law right now, folks. It's important. We've had testimony in the case regarding Mr. Rutledge's mental health. There was some testimony regarding this probate warrant. I've allowed some of that testimony. Some of it came in through the State; some of it came in through the defense.
>
> But at this point, I'm going to give you an instruction that I'm going to allow some further questions regarding Mr. Rutledge's alleged mental condition both before and during the relevant time frame here, but the purpose of the testimony is to provide background information and to explain circumstances of what

actions the police may have taken or not taken. So it's not being offered for the truth of the matter.

So, in other words, we have no expert testimony here about his mental condition. The law allows certain testimony at times to be offered not for the truth of the matter, and that can be confusing. But, in other words, the police may have taken certain actions because they had this information.

It doesn't mean the information is true; it means this is information they were given, and as a result, did they take certain actions. It's not being offered for the truth of the matter. You can't consider it for the truth of the matter.

And, in addition, Ohio law does not permit you to consider the testimony so far as it relates to Mr. Rutledge's mental-health condition with regard to whether or not he could form the intent or any of the mental elements with regard to the offenses.

(Tr. at 1583-85.)

{¶ 34} Defense counsel objected to this instruction at trial, arguing that it would mislead the jury as to its actual theory of defense. Defense counsel asserted it was not attempting to use a diminished capacity defense but instead planned to use the evidence of Rutledge's mental health as one factor for the jury to consider in determining whether Rutledge possessed the requisite mens rea for the offenses. The trial court overruled Rutledge's objection, noting the defense's argument was one of semantics in which it was attempting to pursue the functional equivalent of a diminished capacity defense without labeling it as such.

{¶ 35} During the final instructions to the jury, the trial court again instructed the jury on this issue, stating:

I also instructed you that Ohio law does not recognize the partial defense of diminished capacity, and as a result, you are not to consider any evidence of mental illness or mental instability in determining whether the defendant possessed the required mental states of prior calculation and design, purposely or knowingly to commit the crimes.

However, I caution you, the State still must prove all the elements of each charge including the above required mental

> states beyond a reasonable doubt, and you may consider all of the other facts and circumstances introduced as evidence in determining the defendant's mental state during the events in question.

(Tr. at 2600-01.)

{¶ 36} On appeal, Rutledge reiterates the argument he made at trial. He continues to assert he was not attempting to use evidence of his mental health to show total incapacity, or diminished capacity; rather, he asserts the evidence was intended to be considered as a mere factor impacting the total calculation of whether he had formed the required mental state for each of the crimes. Stated another way, Rutledge argues he was not attempting to show whether he *could* form the requisite mental state but instead was attempting to show whether he *had* formed the requisite mental state. Under the law of diminished capacity in Ohio, however, we find this to be a distinction without a difference. We agree with the trial court that Rutledge's argument in this regard is a matter of semantics that still amounts to the functional equivalent of a diminished capacity defense. As the Supreme Court held in *Fulmer*, when "a defendant asserts the functional equivalent of a diminished-capacity defense, the trial court should instruct the jury to disregard the evidence used to support that defense unless the defendant can demonstrate that the evidence is relevant and probative for purposes other than a diminished-capacity defense." *Fulmer* at ¶ 70.

{¶ 37} Here, the trial court's instructions adequately and appropriately informed the jury that it could consider the evidence of Rutledge's mental health in the context of what information the police had at the time and how that information impacted the police's response to the situation, but the jury could not consider the evidence of Rutledge's mental health to determine whether Rutledge possessed the required mental states for the offenses. The trial court's instruction was an accurate statement of Ohio law, and it did not mislead the jury as to the defense Rutledge was attempting to present. Having considered the jury instruction as a whole, we find the trial court did not abuse its discretion in instructing the jury on the issue of Rutledge's mental health. We overrule Rutledge's second assignment of error.

## V.  Third Assignment of Error – Ineffective Assistance of Counsel

{¶ 38}  In his third assignment of error, Rutledge argues he received the ineffective assistance of counsel.  More specifically, Rutledge asserts his trial counsel was ineffective for failing to proffer evidence of specific mental health diagnoses during the trial phase.

{¶ 39}  In order to prevail on a claim of ineffective assistance of counsel, Rutledge must satisfy a two-prong test.  First, he must demonstrate that his counsel's performance was deficient.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  This first prong requires Rutledge to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  If Rutledge can so demonstrate, he must then establish that he was prejudiced by the deficient performance.  *Id.*  To show prejudice, Rutledge must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different.  A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial.  *Id.* at 694.

{¶ 40}  In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101.  Rutledge contends his trial counsel was ineffective in failing to proffer evidence of specific mental health diagnoses during the trial phase.  In particular, Rutledge argues that had his trial counsel proffered the expert opinions regarding Rutledge's specific mental health diagnoses, the trial court may have ruled differently on the admissibility of the other evidence related to Rutledge's mental health discussed in the second assignment of error.

{¶ 41}  In order to succeed on a claim of ineffective assistance of counsel, an appellant must overcome the strong presumption that, under the circumstances, the challenged action could be considered a sound trial strategy.  *State v. Dixon*, 10th Dist. No. 03AP-564, 2004-Ohio-3374, ¶ 13.  A reviewing court "must refrain from second-guessing counsel's strategic decisions."  *Id.*, citing *State v. Carter*, 72 Ohio St.3d 545, 557-58 (1995), citing *Strickland* at 689.

{¶ 42}  During the penalty phase of the case, trial counsel presented expert testimony that Rutledge has specific mental health diagnoses including anxiety, depression, and delusional disorder with persecutory features.  Rutledge argues on appeal that a proffer at

trial of this specific evidence would have aided his defense at trial, but he does not specify how. Notably, trial counsel stated on the record that the evidence would be used as mitigation and planned to reserve it as such rather than introduce it at trial. Though trial counsel could have proffered the information, Rutledge does not explain how such a proffer would have helped him during the trial phase as the trial court ruled, correctly, that Ohio does not recognize a diminished capacity defense. *See Dixon* at ¶ 14 ("[f]ailing to raise meritless issues does not constitute ineffective assistance of counsel"), citing *State v. Elson*, 5th Dist. No. 1996CA00142 (June 9, 1997) (trial counsel did not err by failing to proffer expert testimony that appellant's seeing his ex-wife in a new relationship "caused extreme rage in appellant," as the testimony was inadmissible). *See also State v. Warren*, 8th Dist. No. 83823, 2004-Ohio-5599, ¶ 31 (noting "a failure to proffer does not constitute ineffective of counsel per se," and, where the failure to proffer appears to be a matter of sound strategy, it will not substantiate a claim of ineffective assistance of counsel).

{¶ 43} Thus, we conclude Rutledge's trial counsel's decision not to proffer the expert testimony related to his specific mental health conditions was not objectively unreasonable or deficient. *Dixon* at ¶ 15 (noting "appellant's counsel was under no obligation to proffer for the record the testimony of a witness he did not call"). We overrule Rutledge's third assignment of error.

## VI. Fourth Assignment of Error – Response to Juror Question

{¶ 44} In his fourth and final assignment of error, Rutledge argues the trial court erred when it incorrectly lowered the state's burden to prove Rutledge's mental state for the offense of felonious assault in response to a jury question.

{¶ 45} "Where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request." *Carter*, 72 Ohio St.3d at paragraph one of the syllabus. *See also State v. Preston-Glenn*, 10th Dist. No. 09AP-92, 2009-Ohio-6771, ¶ 28 ("[i]t is within the sound discretion of the trial court to provide supplemental instructions in response to a question from the jury"). "The trial court's response to a jury's question, when viewed in its entirety, must be a correct statement of law and be consistent with or supplement the instructions previously given to the jury." *State v. Jones*, 10th Dist. No.

15AP-670, 2017-Ohio-1168, ¶ 17, citing *Preston-Glenn* at ¶ 28. We review a trial court's response to a jury's question for an abuse of discretion. *Jones* at ¶ 17.

{¶ 46} The trial court initially provided the following instruction to the jurors in the context of the elements of felonious assault: "The offense of felonious assault is knowingly causing or attempting to cause physical harm to another by means of a deadly weapon and/or knowingly causing serious physical harm to another." (Tr. at 2615.) The trial court further instructed the jury that "[a] person acts knowingly, regardless of his purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." (Tr. at 2602.)

{¶ 47} After the jurors retired to deliberate, they sent three questions to the trial court. The question at issue here was "[i]f one believes no shots fired by the suspect were an attempt to hurt someone, can that person agree with felonious assault?" (Tr. at 2670.) The trial court conferred with counsel for Rutledge and the state regarding the appropriate response. Ultimately, over defense counsel's objection, the trial court gave the following response to the jury:

> A person's purpose or intent is not required to be established by the prosecution in order to prove felonious assault. If a person fires shots knowing that the shots probably could harm someone and the other elements are proven beyond a reasonable doubt, then the person could be convicted of felonious assault. On the other hand, if a juror has a reasonable doubt the person did not knowingly cause or attempt to cause physical harm, then the person could not be convicted by that juror or jurors.

(Tr. at 2676.)

{¶ 48} Rutledge argues the response to the jury question contained an inaccurate statement of law. Specifically, Rutledge asserts the definition of knowingly requires the person to know his or her conduct "will probably" cause a certain result or "will probably" be of a certain nature. R.C. 2901.22(B). By instructing the jury that the person knows his or her conduct "probably *could* harm someone," Rutledge argues the trial court impermissibly lowered the state's burden of proof on the mens rea element. (Emphasis added.) Stated another way, Rutledge argues the trial court's use of the phrase "probably

could harm" lowers the state's evidentiary burden from the statutory language of "will probably cause a certain result."

{¶ 49} We note that Rutledge provides no citation to authority supporting his contention that the trial court's use of the phrase "probably could harm" rendered the instruction an inaccurate statement of law. Even if we were to agree with Rutledge that the trial court's response to this question from the jury did not precisely track the statutory language of R.C. 2901.22(B), we nonetheless would not conclude that the trial court abused its discretion in its response to the jury question. As noted above, we must not consider instructions to the jury in isolation and instead must consider the charge to the jury as a whole. In its instructions to the jury prior to deliberations, the trial court correctly instructed the jury on the definition of knowingly. Then, in answering the first and third questions submitted by the jury, all of which pertained to the offense of felonious assault, the trial court specifically directed the jury to refer back to the written instructions containing the correct definition of knowingly. Thus, when the trial court's instructions to the jury on the three questions are read in context, and not in isolation, we find the trial court's response to the jury question was consistent with the instructions previously, and accurately, given. *Jones* at ¶ 20 (where "[t]he trial court specifically drew the jury's attention to the elements of the offenses given in the jury instructions at the close of trial," the trial court did not abuse its discretion in its response to a jury question after the start of deliberations), citing *Preston-Glenn* at ¶ 29. Given the overall context within which the instruction was given, we therefore conclude the trial court did not abuse its discretion in responding to the jury question.

{¶ 50} Accordingly, we overrule Rutledge's fourth and final assignment of error.

## VII. Disposition

{¶ 51} Based on the foregoing reasons, the trial court did not abuse its discretion in declining to instruct the jury on the lesser-included offense of reckless homicide, the trial court did not err in instructing the jury on the evidence of mental illness, Rutledge did not receive the ineffective assistance of counsel, and the trial court did not abuse its discretion

in responding to a jury question during deliberations.  Having overruled Rutledge's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and BRUNNER, JJ., concur.

———————————————